Filed 6/5/15  P. v. Craig CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, Plaintiff and Respondent, v. DONTAYE COLEMAN CRAIG et al., Defendants and Appellants. | D063070 (Super. Ct. Nos. SCD225297, SCD234772) |

APPEALS from a judgment of the Superior Court of San Diego County, Charles G. Rogers, Judge.  Affirmed in part as modified; reversed in part with directions.

Mary Woodward Wells, under appointment by the Court of Appeal, for Defendant and Appellant Dontaye Craig.

Patricia J. Ulibarri, under appointment by the Court of Appeal, for Defendant and Appellant Rashad Scott.

Boyce & Schaefer and Robert E. Boyce, under appointment by the Court of Appeal, for Defendant and Appellant Fredrick Roberson.

Kamala D. Harris, Attorney General, Julie L. Garland, Assistant Attorney General, Peter Quon, Jr. and Randall D. Einhorn, Deputy Attorneys General, for the Plaintiff and Respondent.

Defendants, Dontaye Coleman Craig, Fredrick Dwayne Roberson, and Rashad Phillip Scott, instigated a physical altercation with rival gang members in the Gaslamp Quarter area of downtown San Diego. During the fight a rival gang member was shot several times, and stray bullets struck two bystanders, killing one of them.

Defendants were charged with first degree murder (Pen. Code[1], § 187, subd. (a); count 1), attempted murder (§§ 664/187, subd. (a); count 2), and assault with a firearm (§ 245, subd. (a)(2); count 3). The prosecution's primary argument was that Craig was the shooter, but there was also evidence Roberson was the shooter. All Defendants were prosecuted as perpetrators, direct aiders and abettors, and aiders and abettors of the target crimes of simple assault or public fight, the natural and probable consequences of which were the shootings.

The jury convicted Defendants on all counts. On counts 1 and 2, the jury found true that a principal personally used a firearm within the meaning of section 12022.53, subds. (b)-(e)(1)), and as to counts 1 through 3, it found true the allegation that

---

[1] Statutory references are to the Penal Code unless otherwise specified.

2

defendants committed the offenses for the benefit of, at the direction of, or in association with a criminal street gang within the meaning of section 186.22, subdivision (b)(1). The court sentenced Defendants to lengthy prison terms.[2]

On appeal, Defendants challenge the sufficiency of the evidence to support their convictions and raise a variety of additional issues. While their appeals were pending, the California Supreme Court held in *People v. Chiu* (2014) 59 Cal.4th 155, 158-159 (*Chiu*), that as a matter of law there is no aider and abettor culpability for first degree premeditated murder under the natural and probable consequences doctrine. The People concede the judgment must be reversed insofar as Defendants' first degree murder convictions are concerned because the jury was instructed guilt could be based on the natural and probable consequences doctrine, and the record does not show beyond a reasonable doubt that the jury did not rely on the doctrine.

As to Craig and Roberson, we direct the trial court to give the People the option of accepting a reduction of the first degree murder convictions to second degree murder or retrying them on the greater offense. (*Chiu, supra,* 49 Cal.4th at p. 168.) We modify Scott's judgment to reduce his first degree murder conviction to second degree murder. Under double jeopardy principles, Scott cannot be retried for first degree murder because

---

2    The court sentenced Craig to 11 years and eight months, plus 75 years to life; and Scott, a 17-year-old when the crimes were committed, to 35 years to life. Roberson admitted to two prior strike convictions (§ 667, subds. (b)-(i)), one prior serious felony conviction (§ 667, subd. (a)(1)), and one prior prison term (§ 667.5, subd. (a)). The court sentenced him to 20 years, plus 189 years to life.

the prosecution adduced no evidence he was the shooter or directly aided and abetted the shooting. (*People v. Hatch* (2000) 22 Cal.4th 260, 271-272.) Additionally, we reverse the 10-year gun enhancement imposed on Scott on count 1, as that term was unauthorized. In conjunction with Scott's resentencing, the court is to reconsider the gun enhancement term in accordance with this opinion.

We also modify the judgment to delete Roberson's consecutive five-year gang enhancement imposed on count 3 under section 186.22, subdivision (b)(1) and to replace it with the 15-year minimum term for parole eligibility required by section 186.22, subdivision (b)(5). Further, we direct the court to modify Defendants' abstracts of judgment to comport with its oral pronouncement that victim restitution was ordered on a joint and several basis, and in the amount of $14,578.87. Defendants' remaining contentions are unpersuasive, and thus we affirm the judgments in all other respects as modified.

## FACTS[3]

Defendants and Marlon Johnson were active members of the criminal street gang Emerald Hills, an affiliate of the Bloods gang. Johnson had moved to Los Angeles, and on May 23, 2009, a Saturday during Memorial Day weekend, he drove to San Diego and met up with Defendants. They spent their time together drinking and smoking marijuana. That evening, Defendants and Johnson went to the Solola Apartment complex, where

---

[3] We recite the evidence most favorable to the judgment. (*People v. Watkins* (2012) 55 Cal.4th 999, 1023.)

they had their photograph taken together (Solola photo).

Early on May 24, 2009, near the closing time for bars, Johnson drove Defendants to the Gaslamp Quarter. The Gaslamp Quarter is not claimed by a particular gang, but members from different gangs frequent the area.

Johnson parked near the intersection of E Street and Fifth Avenue, and he and Defendants walked west on the north side of E Street. They were conspicuous because they were not dressed in club attire. Craig, Roberson, and Scott wore black hooded sweatshirts (hoodies), and under his hoodie Scott wore a distinctive black, white, and green striped shirt. Roberson also wore gloves and a gray baseball cap with an "SD insignia" on it. Johnson wore a gray tee shirt and a du-rag.

Richard Turner was a documented member of the criminal street gang West Coast Crips, a main rival of Emerald Hill. At about 2:00 a.m. on May 24, Turner and some friends left Belo, a club on the north side of E Street. Roberson and Scott, who were walking ahead of Craig and Johnson, encountered Turner's group. Roberson and Scott were acting aggressively, and Johnson heard them say "multiple things" to Turner's group, but he could not make out the content.

A witness saw three or four men walking west on E Street toward Belo. The first two men in the group wore dark hoodies, and about four or five minutes before the shooting he heard one of them say, "What's that Emerald like, motherfucker?" He also heard "a lot of gang language" and "different gang names." The comments made this witness fear "something bad might happen." Another witness also heard gang challenges,

5

such as "Blood, what's brackin?" (Bloods), and "What's crackin?" and "Cuz" (Crips).

Roberson and Scott continued walking west, and when Johnson and Craig got to Turner, he bumped into Johnson and said, "What did you say?" Johnson denied saying anything. According to Turner, Johnson grabbed his chain and displayed a gun. Turner smacked Johnson's hand and said, "Don't touch me." Turner pounded his fist into his hand and loudly said, "Let's get it on."

It was unclear how many people were with Turner, so Craig directed Johnson to fetch Roberson and Scott. Both Craig and Johnson caught up with them at the northeast corner of E Street and Fourth Avenue, and Johnson said he "was ready to go." Johnson and Craig crossed to the south side of E Street and headed east to get to Johnson's car. When Johnson reached the southwest corner of E Street and Fifth Avenue, he ran into a friend and stopped to chat. Roberson and Scott had also crossed to the south side of E Street and they joined Johnson and Craig. While Johnson was busy with his friend, Craig, Roberson, and Scott talked.

Turner's group had headed east on the north side of E Street, and someone in Defendants' group said, "There he go over there." At that point, Defendants returned to the north side of E Street. Johnson heard "a loud dispute" and followed Defendants.

Witnesses heard the exchange of more gang terms, such as "Uptown Emerald Hills," and, "This is Crip, this is Crip." Johnson saw Roberson and Scott together "backing into the middle of the street." Johnson grabbed Roberson, but Roberson

"looked like he was ready to go," meaning "get active, fight." Roberson threw off his hoodie and sucker punched a member of Turner's group. A fight ensued in the street, which was crowded with club goers

Johnson's attention then turned to Turner. Johnson approached Turner "about to fight," and two photographs taken during the incident show them facing each other and "posturing." Before they threw any punches, however, several gunshots rang out. A witness heard the shooter say, "I don't chuck 'em," which she took to mean in gang lingo, "I don't fight." When the shooting stopped, Defendants and Johnson ran to his car and fled to the Solola Apartment complex.

Turner was shot multiple times and seriously injured. Lakiesha Mason, a bystander celebrating her 21st birthday, was shot in the head and killed, and Willy Aldridge, another bystander, was shot in the back and seriously injured.

A black hoodie, a gray baseball cap with an "SD" insignia, and four .38-special-caliber bullet fragments were found at the scene. Roberson's DNA was found on the hoodie and the cap, and gunshot residue was found on the hoodie. When Roberson was arrested in August 2010, he had a baseball cap with an "SD" insignia that was nearly identical to the one found at the scene.

Johnson was indicted on the same charges as defendants, but he eventually agreed to plead guilty to voluntary manslaughter and admit to a gang allegation in exchange for

7

his testimony.[4] In addition to providing many of the facts recounted above, he identified Roberson and Scott in a video taken near Belo shortly before the shooting. Johnson also identified himself as squaring off against Turner in two photographs someone took during the fight. Johnson testified that when the photographs were taken, Roberson and Scott were standing to his left and Craig was standing to his left and slightly behind him. Shadowy figures near Johnson in one of the photos were Defendants, and it appeared that Craig's arm was extended.

Further, Johnson testified Roberson was not wearing either his hoodie or his cap when he returned to the car. Johnson identified the hoodie and cap found at the scene as the ones Roberson wore. When Johnson and Defendants reached his car, Johnson asked who did the shooting. Craig, who was in the front seat, was holding a gun and admitted he was the shooter.

Johnson's former girlfriend, Carmen Torres, testified Johnson was with her in the early morning hours of May 24, 2009. Johnson told her he went downtown with friends and "after the club, they got into an altercation and one of his friends started shooting." The only friend Johnson mentioned by name was Craig.

Tony Mallard testified that at his birthday party in October 2010, Craig told him he tried to shoot "a Crip dude" in the Gaslamp, and he accidentally shot a woman. Craig

---

4    Johnson faced a prison term of between three and 11 years. He is to serve his sentence in protective custody, and he may be relocated when he is released.

also told Mallard "he was going to let the other guys take the fall for him." Mallard asked Craig why he "parties every day," and Craig said "he partied like it might be the last time."

Candace Hosburg witnessed the events, mostly from the outside patio of a bar on the south side of E Street. She testified she heard a verbal altercation across the street. She looked over and saw three men, one of whom she later identified as Turner. He was "yelling something" and was "pretty hyped up." The two other men walked west toward Fourth Avenue. One of them was dressed in a gray shirt, jeans, and a du-rag, and the other was dressed in a black leather jacket and jeans.

Hosburg lost sight of the man in the leather jacket. She kept her eye on Johnson because she "just felt something was wrong." He crossed to the south side of E Street and headed east. He walked up to two men wearing black hoodies and standing by a tree in front of the patio. The three men talked for about a minute, and then crossed to the north side of E Street. The men wearing hoodies raised the hoods over their heads. A fight broke out between two groups, and people were throwing punches at each other. She heard gunshots, but she did not see the shooter.

From the Solola photo, Hosburg identified Johnson as the man in the gray shirt and du-rag. She also identified Scott as one of the men standing by the tree and "one of the people who walked into the street with [Johnson]." She was asked, "The male with the striped shirt, does he look similar to the person you saw? Or you think that is the person you saw?" She responded, "That is the person that I saw." She was then asked,

9

"So you're sure about that?," and she responded, "Yes." She identified Craig from the photo as looking similar to the man in the black leather jacket, based on his "build and his height."

Numerous witnesses observed the shooter, and their descriptions varied considerably. Craig's attorney referred to him as "some six-foot-three, 285 pounds." Several witnesses described the shooter as tall, up to 6 feet 3 inches tall, between 200 and 220 pounds, and wearing a black hoodie and jeans or dark pants. Other witnesses described the shooter as shorter, from 5 feet 8 to 10 inches tall, and "kind of chunky" or weighing approximately 170 pounds.

One witness testified the shooter wore a black hoodie and a baseball cap with an "SD" insignia, and as he ran off it appeared he was removing the hoodie. When presented with one of the photographs taken of Turner and Johnson preparing to fight, this witness testified the shadowy figure behind Johnson was the shooter, the figure Johnson identified from the photo as Craig. Another witness testified the shooter wore a "hooded sweatshirt," and it "[l]ooked like he had a hat on."[5]

San Diego Police Detective David Collins, a gang expert, testified Emerald Hills's primary activities included "narcotics, assaults, murder, pimping." He described several

---

[5] One witness told an investigator that he thought Johnson was the shooter. At trial, however, this witness clarified that he thought Johnson was armed because "it looked like he was pulling up his pants" and "maybe [he] could have been reaching for a gun."

10

predicate offenses involving shootings by Emerald Hills gang members.[6]  Further, he testified Emerald Hills and the West Coast Crips have a "violent rivalry."

Detective Collins explained the importance of respect in gang culture.  If a gang member feels disrespected, he must retaliate "to keep [his] status within the gang."  It is "a clear sign of disrespect" for a rival gang member to "call out" the name of his gang.  The calling out of a rival gang name is a "challenge," or "hit-up."  If "you have a rival calling it out, you should step up and take care of business at that point, and that may mean either challenging them and backing them down, or, if you have to, beat them down or do whatever you have to do to show that . . . you are the number one gang."  Gang members know a hit-up will cause "at bare minimum, a physical fight," and that fights often escalate, involve deadly weapons, and result in serious injury or death.

Further, gang members "travel in packs because there's security in numbers." They back up each other, and if a member fails to provide back up, at a "bare minimum, you're going to get what's called DP, or disciplinary punishment.  Your own gang will

---

[6]     In May 2005, Terrence Jarvis was convicted of shooting at a car driven by a rival gang member through Emerald Hills territory, and Tyree Shine was convicted of assault with a firearm.  A one-year-old child was also in the car.  When Jarvis was arrested a .38-caliber gun was found nearby.  In April 2007, Jonathan Hensley was convicted of attempted murder while armed with a firearm, and Craig Phillip Nash was convicted of attempted murder.  The victim, a minor and Crips gang member, came to San Diego to visit his girlfriend.  She arranged for the victim to stay at an apartment, which unbeknownst to her was inhabited "with Blood gang members."  Nash believed the victim was there to "put a hit in on" him, and he decided to "do a preemptive strike." Hensley was called, and he arrived with a gun.  As the victim tried to flee he was shot.  In March 2008, Malcolm Jackson was convicted of possession of a firearm by a felon.

11

come in and discipline you for failing to follow through in backing up the homies." The DP could be anything from "a beat down" to death.

Detective Collins was asked a hypothetical question with the facts of this case, and he explained it "would definitely promote the gang in the sense that [Defendants] have gone back after their rival. In a crowded street, . . . they've challenged that rival and they've taken that rival down through a shooting. The use of the gun is basically the ultimate power that a gang member can have in the sense of controlling someone." Guns are a status symbol in gang culture, and a member willing to use a gun "is going to have more status" because gun use "creates . . . fear and intimidation."

## DISCUSSION[7]

### I

### *First Degree Premeditated Murder/Chiu Opinion*

"Both aiders and abettors and direct perpetrators are principles in the commission of a crime." (*People v. Calhoun* (2007) 40 Cal.4th 398, 402; § 31.) "[A]iding and abetting is one means under which derivative liability for the commission of a criminal offense is imposed. It is not a separate criminal offense." (*People v. Francisco* (1994) 22 Cal.App.4th 1180, 1190.) "There are two distinct forms of culpability for aiders and abettors. 'First, an aider and abettor with the necessary mental state is guilty of the

---

[7]     In their briefing, Defendants make a blanket statement that they join in each others' claims to the extent they accrue to their benefit and are not inconsistent with their own arguments. In a recent opinion, the California Supreme Court strongly disapproved of this practice. (*People v. Bryant* (2014) 60 Cal.4th 335, 363.)

12

intended crime. Second, under the natural and probable consequences doctrine, an aider and abettor is guilty not only of the intended crime, but also "for any other offense that was a 'natural and probable consequence' of the crime aided and abetted." ' " (*Chui, supra,* 59 Cal.4th at p. 158.)

*Chui, supra,* 59 Cal.4th 155, holds that an aider and abettor may be convicted of second degree murder, but not first degree murder, under the natural and probable consequences doctrine. (*Id.* at pp. 158, 166.) "[P]unishment for second degree murder is commensurate with a defendant's culpability for aiding and abetting a target crime that would naturally, probably, and foreseeably result in a murder under the natural and probable consequences doctrine. . . . [W]here the direct perpetrator is guilty of first degree premeditated murder, the legitimate public policy considerations of deterrence and culpability would not be served by allowing a defendant to be convicted of that greater offense under the natural and probable consequences doctrine." (*Id.* at p. 166.)

The opinion explains: "First degree murder, like second degree murder, is the unlawful killing of a human being with malice aforethought, but has the additional elements of willfulness, premeditation, and deliberation which trigger a heightened penalty. [Citation.] The mental state is uniquely subjective and personal. It requires more than a showing of intent to kill; the killer must act deliberately, carefully weighing the considerations for and against a choice to kill before he or she completes the acts that caused the death." (*Chui, supra,* 59 Cal.4th at p. 166.)

An aider and abettor may still be convicted of first degree premeditated murder based on direct aiding and abetting principles. (*Chui, supra,* 59 Cal.4th at p. 166.)

13

"Under those principles, the prosecution must show that the defendant aided or encouraged the commission of the murder with knowledge of the unlawful purpose of the perpetrator and with the intent or purpose of committing, encouraging, or facilitating its commission." (*Id.* at p. 167.)

"When a trial court instructs a jury on two theories of guilt, one of which was legally correct and one legally incorrect, reversal is required unless there is a basis in the record to find that the verdict was based on a valid ground." (*Chiu, supra,* 59 Cal.4th at p. 167.) Thus, a defendant's "first degree murder conviction must be reversed unless we conclude beyond a reasonable doubt that the jury based its verdict on the legally valid theory that defendant directly aided and abetted the premeditated murder." (*Ibid.*)

The People concede the record does not permit a conclusion the jury did not base Defendants' first degree murder convictions on the natural and probable consequences doctrine. Accordingly, we reverse the judgment insofar as it pertains to the first degree murder convictions. As to Craig and Roberson, we remand the matter to the trial court with directions to give the People the opportunity to accept reductions of their convictions to second degree murder or retry them for first degree murder on the ground they were direct perpetrators, and Craig on the alternative ground he was a direct aider and abettor.[8] (*Chui, supra,* 59 Cal.4th at p. 168.) Because the People did not adduce evidence Roberson was a direct aider and abettor, under double jeopardy principles he

---

[8]    We discuss the evidence against Defendants below.

14

cannot be retried for first degree murder on that theory. (*People v. Hatch, supra,* 22 Cal.4th at pp. 271-272 [an appellate ruling of legal insufficiency is functionally equivalent to an acquittal and precludes a retrial].)

As to Scott, we reduce his conviction to second degree murder. Double jeopardy precludes his retrial for first degree murder because the evidence does not support a finding he was the shooter or a direct aider and abettor. The evidence only permits a finding of indirect aiding and abetting under the natural and probable consequences doctrine.

II

*Substantial Evidence*

A

Defendants challenge the sufficiency of the evidence to support their convictions. " ' "In assessing the sufficiency of the evidence, we review the entire record in the light most favorable to the judgment to determine whether it discloses evidence that is reasonable, credible, and of solid value such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." [Citation.]' [Citation.] We presume in support of the judgment the existence of every fact that could reasonably be deduced from the evidence. [Citation.] We may reverse for lack of substantial evidence only if ' "upon no hypothesis whatever is there sufficient substantial evidence to support" ' the conviction." (*People v. Garcia* (2007) 153 Cal.App.4th 1499, 1508.) Since we reverse

15

Defendants' first degree murder convictions, we determine whether substantial evidence supports convictions for second degree murder, attempted murder, and assault with a firearm.

B

Craig contends there is insufficient *credible* evidence to support his convictions. He urges us to reject the testimony of Johnson as untrustworthy since he is a "self-admitted liar . . . who avoided a murder conviction and certain life sentence by agreeing to cooperate with the government."  Johnson admitted he initially lied during the investigation.  He testified he believed he was facing a life sentence and would probably die in prison, and he turned state's evidence to "get a deal."

Further, the jury heard the testimony of two Emerald Hills members who were incarcerated at the same facility as Johnson before he turned state's evidence.  Kevin Wiggins testified Johnson said he was so afraid of receiving a life sentence and not seeing his family again that he contemplated suicide.  Johnson did not mention that Roberson and Scott were involved in the Gaslamp Quarter incident.  Johnson told Wiggins he did not know who the shooter was, and he intended to make up a story, "get a deal" and "go home."

Tommy Jacquett testified Johnson told him he did not know who the shooter was. Johnson said he would kill himself because "he couldn't do that kind of time."  His "baby mama" "was kind of on him about his little daughter growing up," and he "was going to

have her try to see . . . if they would propose a deal to him." The jury also heard the testimony of Johnson's former girlfriend, Torres, that he told her "he just wants to get out of [jail], like, now, by any means necessary to get out."

The jury nonetheless presumably found Johnson to be a credible witness, and it is not within our province to reassess witness credibility or reweigh the evidence. (*People v. Guzman* (2011) 201 Cal.App.4th 1090, 1098.) " ' " 'Conflicts and even testimony which is subject to justifiable suspicion do not justify the reversal of a judgment, for it is the exclusive province of the . . . jury to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends.' " ' " (*Bloxham v. Saldinger* (2014) 228 Cal.App.4th 729, 750.)

Additionally, Craig contends Johnson's testimony was insufficiently corroborated. Under section 1111, a conviction cannot be based on the testimony of an accomplice unless it is corroborated by other evidence tending to connect the defendant with the commission of the crime. "The evidence . . . need not corroborate every fact to which the accomplice testifies. [Citations.] ' "Corroborating evidence may be slight, may be entirely circumstantial, and need not be sufficient to establish every element of the charged offense. [Citations.]" . . . The evidence "is sufficient if it tends to connect the defendant with the crime in such a way as to satisfy the jury that the accomplice is telling the truth." ' " (*People v. Whalen* (2013) 56 Cal.4th 1, 55; *People v. Abilez* (2007) 41 Cal.4th 472, 505 [corroborating evidence need not be "substantial"].) "Section 1111

17

serves to ensure that a defendant will not be convicted solely upon the testimony of an accomplice because an accomplice is likely to have self-serving motives." (*People v. Davis* (2005) 36 Cal.4th 510, 547.)

The court properly instructed the jury that Johnson was an accomplice, and thus his testimony must be corroborated. Mallard was not an accomplice, and he sought a benefit but received none. He appeared under subpoena, explaining, "I don't even want to be here." He testified he ran into Craig at a party in October 2010, and Craig admitted he tried to shoot "a Crip dude" in the Gaslamp, and he accidentally shot a woman. Further, Craig told Mallard he intended to "let the other guys take the fall for him," and he partied every day because "it might be the last time."

Craig asserts we must reject Mallard's testimony as "inherently unbelievable" because at the time of trial he was in jail on a domestic violence charge, and "there was no question [he] was looking for a benefit when he approached law enforcement . . . with the offer of information on the Gaslamp shootings." Craig cites no authority for the proposition testimony is inherently improbable when given by a witness who sought, but did not receive, a benefit. Indeed, as discussed further below, Mallard's testimony actually had *heightened* credibility because he was threatened against testifying. (*People v. Mendoza* (2011) 52 Cal.4th 1056, 1084.)

" 'The trier of fact's determination on the issue of corroboration is binding on the reviewing court unless the corroborating evidence should not have been admitted or does not reasonably tend to connect the defendant with the commission of the crime.' " (*People v. Abilez, supra,* 41 Cal.4th at p. 505.) Mallard's testimony reasonably tended to

18

connect Craig to the shootings. We conclude substantial evidence supports Craig's convictions.

C

1

Roberson contends substantial evidence does not support a finding the shootings were a natural and probable consequence of the fistfight. He does not dispute that he participated in the fistfight.

"The natural and probable consequences doctrine is based on the recognition that those who aid and abet should be responsible for the harm they have naturally, probably, and foreseeably put in motion." (*People v. Avila* (2006) 38 Cal.4th 491, 567.) "Accordingly, ' "[a] person who knowingly aids and abets criminal conduct is guilty of not only the intended crime [target offense] but also of any other crime the perpetrator actually commits [nontarget offense] that is a natural and probable consequence of the intended crime. The latter question is not whether the aider and abettor *actually* foresaw the additional crime, but whether, judged objectively, it was *reasonably* foreseeable. [Citation.]" [Citation.] Liability under the natural and probable consequences doctrine "is measured by whether a reasonable person in the defendant's position would have or should have known that the charged offense was a reasonably foreseeable consequence of the act aided and abetter." [¶] . . . A reasonably foreseeable consequence is to be evaluated under all the factual circumstances of the individual case [citation] and is a factual issue to be resolved by the jury.' " (*People v. Ayala* (2010) 181 Cal.App.4th 1440, 1449.)

19

It is true that aiding and abetting a "trivial" target offense will not justify imposition of liability for a serious crime under the natural and probable consequences doctrine. (*People v. Prettyman* (1996) 14 Cal.4th 248, 269.) "Murder, for instance, is *not* the 'natural and probable consequence' of 'trivial' activities. To trigger application of the 'natural and probable consequences' doctrine, there must be a close connection between the target crime aided and abetted and the offense actually committed." (*Ibid.*)

Case law shows, however, that in the context of gang warfare a fistfight may not be trivial for purposes of the natural and probable consequences doctrine. In *People v. Montes* (1999) 74 Cal.App.4th 1050 (*Montes*), the defendant, a member of the Orange Krazy Mexicans gang (OKM), struck a rival gang member with a thick chain as OKM members closed in on the victim. The victim had pulled a switchblade on the defendant. Someone yelled something about a gun, which caused the OKM members to retreat. An OKM member retrieved a gun from a nearby vehicle, ran up to the victim and shot him several times. (*Id.* at p. 1053.) The court held that under the circumstances, the targeted offenses of simple assault and public fighting were not trivial, and it was foreseeable that the altercation would result in the shooting. (*Id.* at p. 1055.)

A gang expert explained the facts represented "a textbook example of how a gang confrontation can easily escalate from mere shouting and shoving to gunfire." (*Montes, supra,* 74 Cal.App.4th at p. 1055.) The expert testified "members of criminal street gangs . . . are expected to back each other up in confrontational situations. This entails using 'whatever weapons are handy' to protect a fellow gang member and establish dominance

20

over another gang. [The expert] believed the circumstances . . . fit the classic pattern of how 'a gang crime escalates from merely yelling something, throwing something, to shooting.' " (*Id.* at p. 1053.)

*Montes* notes that in "a different social era," "street fighters commonly relied on fists alone to settle disputes. Unfortunately, as this case illustrates, the nature of modern gang warfare is quite different. When rival gangs clash today, verbal taunting can quickly give way to physical violence and gunfire. No one immersed in the gang culture is unaware of these realities, and we see no reason the courts should turn a blind eye to them. Given the great potential for escalating violence during gang confrontations, it is immaterial whether [the defendant] specifically knew [a fellow gang member] had a gun." (*Montes, supra,* 74 Cal.App.4th at p. 1056.)

In *People v. Medina* (2009) 46 Cal.4th 913, 927 (*Medina*)), three Lil Watts gang members were involved in a fistfight with a rival gang member, and after the fight was over one of the Lil Watts members shot and killed the rival as he drove away. The Lil Watts members were convicted of murder, the non-shooters under the natural and probable consequences doctrine, and *Medina* affirmed the convictions after reversing the Court of Appeal's opinion. The Court of Appeal had distilled from gang confrontation cases six factors it considered material to their holdings, including (1) the defendant's knowledge of the weapon's presence; (2) the charged crime took place during commission of the target crime; (3) weapons were introduced shortly after the target

crime ensued; (4) the target offense was planned; (5) the gangs were engaged in ongoing rivalry involving past acts of violence; and (6) the defendant agreed to or aided the commission of the serious crime. (*Medina, supra,* at p. 921.)

The Supreme Court criticized the Court of Appeal for finding "it significant that none of the above factors was present, focusing on facts that were *missing,* rather than on the actual evidence presented." (*Medina, supra,* 46 Cal.4th at p. 921.) *Medina* confirms that "prior knowledge that a fellow gang member is armed is not necessary to support a defendant's murder conviction as an aider and abettor." (*Ibid.*) *Medina* explains: "We do not view the existence of those factors as an exhaustive list that would exclude all other types and combinations of evidence that could support a jury's finding of a foreseeable consequence. [Citation.] In other words, the absence of these factors alone is not dispositive." (*Id.* at p. 922.) While evidence of these factors "may constitute sufficient evidence to support an aider and abettor's murder conviction under the natural and probable consequence theory, these factors are not necessary to support such a conviction." (*Id.* at p. 921.))

Several other gang confrontation cases have also affirmed convictions for serious crimes under the natural and probable consequences doctrine. (See, e.g., *People v. Ayala, supra,* 181 Cal.App.4th at pp. 1448-1449, 1451-1452 [fatal shooting was foreseeable result of planned attack with a bat, even though target offense was not actually committed]; *People v. Gonzales* (2001) 87 Cal.App.4th 1, 10-11 [fatal shooting was foreseeable result of fistfight]; *People v. Olguin* (1994) 31 Cal.App.4th 1355, 1376 [fatal shooting was foreseeable result of punching of victim]; *People v. Godinez* (1992) 2

22

Cal.App.4th 492, 499 [fatal stabbing was foreseeable result of fistfight]; *People v. Montano* (1979) 96 Cal.App.3d 221, 227 [shooting was foreseeable result of encouraging a battery].)  Roberson cites no gang warfare case in which a fistfight was deemed trivial for purposes of the natural and probable consequences doctrine.

We conclude the evidence amply supports a finding the shootings were a natural and probable consequence of the fistfight.  Detective Collins testified Emerald Hills's activities included violent crimes such as assaults and murder.[9]  He described several predicate offenses involving shootings by Emerald Hills gang members.  In *Medina, supra,* 46 Cal.4th at p. 918, the court relied in part on testimony by a gang expert that the Lil Watts gang was a violent street gang whose "members primarily committed narcotics offenses involving possession and sales, vandalism, and gun-related crimes, including assaults with firearms and semiautomatic firearms, drive-by shootings, and homicides."

Detective Collins also testified Emerald Hills and the West Coast Crips were "violent rivals."  The evidence shows that when Roberson and Scott encountered Turner, one of them said, "What's that Emerald like, motherfucker?"  Turner or someone in his group presumably responded with their gang affiliation, as a witness heard both Bloods and Crips terms.  *Medina, supra,* 46 Cal.4th at p. 922, notes the incident there was preceded by a gang challenge.  Detective Collins testified that as a general matter, a gang challenge would make gang members feel disrespected, and would require retaliation, and "at bare minimum, a physical fight."  It is unacceptable for a gang to lose respect.

---

9    Roberson joins in Scott's contention the court erred by allowing Detective Collins's testimony.  We reject the contention, as discussed below.

23

"You have to do something to get that respect back immediately." Detective Collins's testimony was similar to the expert testimony cited in *Medina*. (*Medina, supra,* 46 Cal.4th at p. 918 ["[G]ang members view behavior that disrespects their gang as a challenge and a 'slap in the face' which must be avenged. Gang members perceive that, if no retaliatory action is taken in the face of disrespectful behavior, the challenger and others will view the gang member and the gang itself as weak. . . . [V]iolence is used as a response to disrespectful behavior and disagreements as a means to gain respect."].)

Further, the fistfight did not break out spontaneously, it was planned. After gang challenges were exchanged, Defendants crossed to the south side of E Street, away from Turner's group. They could have cooled off and left the area to avoid any violence. To the contrary, after talking, Defendants decided to return to the north side of E Street to confront Turner's group, presumably because they intended to retaliate against Turner's group for disrespecting Emerald Hills. Photographs taken of Johnson and Turner squaring off against each other show several men behind Turner and appearing to back him up. Defendants were unaware of the number of rival gang members they were up against, which increased the potential for the use of any available weaponry and deadly escalation.

Detective Collins explained it is generally known in gang culture that fistfights between rival gang members *often* escalate to involve dangerous weapons and result in serious injury or death. Similarly, in *Medina, supra,* 46 Cal.4th at p. 918, the expert testified that a gang member who asks a rival gang member to identify his gang "could be armed and probably would be prepared to use violence, ranging from a fistfight to

24

homicide. . . . 'In the gang world problems or disagreements aren't handled like you and I would handle a disagreement. . . . When gangs have a disagreement, you can almost guarantee it's going to result in some form of violence, whether that be punching and kicking or ultimately having somebody shot and killed.' " (*Id.* at p. 918.)

Further, Johnson testified he had been an Emerald Hills member for "a period of time," and he was familiar with fights between rival gangs. He knew that incidents "that start off as fistfights" often "evolve into something more," such as shootings or stabbings. He said he should have known the fight could turn deadly. *Medina* cites the testimony of a former gang member in whose home the incident there began. He explained that asking a gang member to identify his gang is an "aggression step," and "if the inquiring gang member was an enemy, the question could lead to a fight or even death. If that gang member had a weapon, he would use it." (*Medina, supra,* 46 Cal.4th at pp. 916-917.)

Roberson attempts to distinguish *Medina* on the ground there was evidence there that is absent in this case. As *Medina* cautions, however, that is not the correct approach. Rather, this case depends solely on its particular circumstances. (*Medina, supra,* 46 Cal.4th at pp. 921-922.) We conclude the evidence amply supports a jury finding "that a person in defendants' position (i.e., a gang member) would have or should have known that retaliation was likely to occur and that escalation of the confrontation to a deadly level was reasonably forseeable." (*Id.* at pp. 922-923.) Thus, Roberson's convictions stand under the natural and probable consequences doctrine.

Roberson also claims there was no evidence to support a finding he was the direct perpetrator. We disagree. By all accounts this is a one-shooter case, and there is strong evidence Craig was the shooter, but there is also evidence from which a jury could reasonably find Roberson was the shooter instead of Craig.

Craig, Roberson, and Scott all wore hoodies during the incident, but Roberson was the only one who also wore a baseball cap. Johnson testified that Roberson removed his hoodie during the incident. A hoodie and baseball cap with Roberson's DNA on them were found at the scene, and the hoodie also contained gun residue. A witness testified the shooter wore a hoodie and it "[l]ooked like he had a hat on." Another witness testified the shooter wore a hoodie with a baseball cap underneath the hood. This witness also testified the shooter took his hoodie off and threw it in the street as he was running away.

Additionally, before Roberson's arrest he made adoptive admissions during wiretapped telephone conversations. (Evid. Code, § 1221.)[10] In one call, Roberson's girlfriend, Dominique Calhoun, relayed a conversation she had with a police officer. The officer asked for her assistance in getting Roberson to come in for an interview because they found his clothing at the scene and "a lot of people from his hood" were saying he

---

[10] Evidence Code section 1221 provides: "Evidence of a statement offered against a party is not made inadmissible by the hearsay rule if the statement is one of which the party, with knowledge of the content thereof, has by words or other conduct manifested his adoption or his belief in its truth."

was the shooter.  In another call, Roberson told an unidentified male he did not know what to do, and police had told him "we found this sweater that . . . has gunshot residue on it and uh, we got your DNA on it so.  . . .  [W]e believe that whoever was wearing the sweater was . . . the shooter."  In another call, Roberson said to an unidentified male, "Somebody from the set, homie told them that I was the one."

In another call, Roberson told an unidentified male that Calhoun had been subpoenaed to testify before the grand jury, and a subpoena was also out for Craig. Roberson indicated he was worried because he got a call from Craig on a restricted number and he was not speaking normally.  Roberson also said Calhoun told him a police officer told her "we got somebody in custody for this uh, Marlon Johnson.  His family is mad because . . . they know . . . he's innocent he didn't—he didn't do the shooting or whatever his families [*sic*] real mad or whatever.  And he's like he shouldn't be in jail for this whatever right?"  The unidentified male stated, "Whoa.  Hold on.  Hold on.  So you're telling me that they're tryin' put that shit on you now?"  Roberson responded, "Yeah . . . they tryin' to say that I'm the shooter."  He added, "They said that they got somebody from Emerald Hills tellin' them—sayin' that."

In yet another call, an unidentified male told Roberson he had heard from Johnson "practically the same shit you been sayin' about your case."  The male said Johnson wanted Roberson to know he "ain't talkin' about you."  During the recorded calls Roberson never denied being the shooter.

" 'For the adoptive admission exception to apply, . . . a direct accusation in so many words is not essential.'  [Citation.]  'When a person makes a statement in the

27

presence of a party to an action under circumstances that would normally call for a response if the statement were untrue, the statement is admissible for the limited purpose of showing the party's reaction to it. [Citations.] His silence, evasion, or equivocation may be considered as a tacit admission of the statements made in his presence.' " (*People v. Riel* (2000) 22 Cal.4th 1153, 1189.) A jury could reasonably infer the statements pertaining to Roberson's involvement in the shooting occurred under circumstances that would normally call for a denial if untrue, and he had a fair opportunity to assert a denial. (*Ibid.*) "If these inferences were reasonable, then it was up to the jury to decide whether [Roberson's] conduct in response to the statement constituted an adoptive admission of its truth." (*Ibid.*) We conclude substantial evidence supports a finding Roberson was the direct perpetrator.

3

We agree with Roberson's contention substantial evidence does not support a *direct* aiding and abetting theory against him. The evidence shows he was either the shooter or an aider and abettor under the natural and probable consequences doctrine.

" '[O]utside of the natural and probable consequences doctrine, an aider and abettor's mental state must be at least that required of the direct perpetrator,' and when the crime is murder, the 'aider and abettor must know and share the murderous intent of the actual perpetrator.' [Citation.] '[A]n aider and abettor will "share" the perpetrator's specific intent when he or she knows the full extent of the perpetrator's criminal purpose and gives aid or encouragement with the intent or purpose of facilitating the perpetrator's commission of the crime.' " (*People v. Madiel* (2013) 57 Cal.4th 482, 518.) The aider

28

and abettor must commit an act "that in fact assists the achievement of the crime." (*People v. Perez* (2005) 35 Cal.4th 1219, 1225.)

We conclude the record does not suggest that if Craig was the shooter, Roberson shared his murderous intent. The evidence does not show Roberson knew Craig intended to shoot Turner or that Roberson said anything or performed any act to facilitate the shooting. Johnson testified that when he and Defendants returned to his car, everyone but Craig "had a look of disbelief on his face." Accordingly, under double jeopardy principles, Roberson cannot be retried for first degree premeditated murder on a direct aiding and abetting theory. He may only be retried for first degree murder as a direct perpetrator, and in that event the jury would have to determine whether he or Craig was the shooter.[11]

---

[11] The situation is different as to Craig, as Johnson testified he had a gun when he returned to the car. Further, Detective Collins explained the "concept of a gang gun," in which "one gang member will control the gun or a number of guns" for use by other gang members. (See *People v. Thompson* (2010) 49 Cal.4th 79, 118 ["regardless of who was the actual shooter, the evidence reasonably supports the inference that defendant assisted the robbery and murder by providing the gun"].) Craig may be retried for first degree murder on the alternative theory of direct aiding and abetting. "[A] sharp line does not always exist between the direct perpetrator and the aider and abettor. . . . 'The aider and abettor doctrine merely makes aiders and abettors liable for their accomplices' actions as well as their own. It obviates the necessity to decide who was the aider and abettor and who the direct perpetrator or to what extent each played which role.' " (*Id.* at p. 118.) In any event, given the length of Craig's and Roberson's sentences, even with a reduction of the murder convictions to second degree, it appears unlikely the People would opt for a retrial.

D

Scott contends, and we agree, that the evidence does not support a finding he was the shooter or that he directly aided and abetted the shooting. The People apparently concede the point, by not addressing those theories as to Scott and focusing solely on his culpability under the natural and probable consequences doctrine. (See *People v. Bouzas* (1991) 53 Cal.3d 467, 480.)

Scott also challenges the sufficiency of the evidence to support a finding he aided and abetted the target crime of simple assault or public fight, for purposes of the natural and probable consequences doctrine. He asserts he was "simply present." He submits that this case is distinguishable from *Medina, supra,* 46 Cal.4th 913, because "there was no evidence [h]e participated in confronting or punching Turner or anyone with him, no evidence he mad-dogged, flipped a gang sign, hollered a gang name."

" '[W]hen a particular aiding and abetting case triggers application of the "natural and probable consequences" doctrine . . . the trier of fact must find that the defendant, act[ed] with (1) knowledge of the unlawful purpose of the perpetrator; and (2) the intent or purpose of committing, encouraging, or facilitating the commission of a predicate or target offense; (3) by act or advice aided, promoted, encouraged or instigated the commission of the target crime.' " (*People v. Guillen* (2014) 227 Cal.App.4th 934, 993.) " '[I]n general neither the presence at the scene of a crime nor knowledge of, but failure to prevent [the crime], is sufficient to establish aiding and abetting its commission.' " (*People v. Campbell* (1994) 25 Cal.App.4th 402, 409.) The jury may, however, consider these factors in determining whether one is an aider and abettor, along with other factors

30

such as " 'companionship, flight, and conduct before and after the crime.' " (*People v. Garcia* (2008) 168 Cal.App.4th 261, 273.)

Scott ignores evidence that he and Roberson exchanged gang challenges with Turner's group near Belo several minutes before the shooting. Roberson and Scott were walking ahead of Craig and Johnson, and witness testimony shows that either Roberson or Scott said, "What's that Emerald like, motherfucker?" Further, this witness heard other gang terms, and another witness heard the exchange of Bloods and Crips terms. Johnson testified Roberson and Scott made comments and behaved aggressively when they passed Turner. Contrary to Scott's position, the trouble did not begin when Johnson encountered Turner's group, it escalated.

Further, Scott could have stayed on the south side of E Street after exchanging gang challenges with Turner's group, but after talking with Roberson and Craig he decided to return to the north side with them to confront Turner's group. Although there is no evidence Scott threw any punches, he stood next to Roberson, Craig, and Johnson, and backed them up. Detective Collins testified that gang members rely on back up from other gang members, and if a gang member failed to provide backup he would suffer disciplinary punishment, which could be anything from a beating to death. Additionally, after the shooting, Scott did not disassociate himself from Roberson, Craig, and Johnson. Rather, he ran with them back to Johnson's car and fled with them to the Solola Apartment complex. We are satisfied that substantial evidence supports a reasonable inference Scott aided and abetted his fellow gang members in the fistfight.

31

## III

### *Evidentiary Rulings*

### A

### *Testimony of Gang Expert*

Scott, joined by Roberson, contends Detective Collins's testimony improperly usurped the jury's role in determining whether the shootings were foreseeable, or a natural and probable consequences of the physical altercation. " 'As a general rule, a trial court has wide discretion to admit or exclude expert testimony.' " (*People v. Valdez* (1997) 58 Cal.App.4th 494, 506.)

" ' "[T]he admission of gang evidence over an . . . objection will not be disturbed on appeal unless the trial court's decision exceeds the bounds of reason. [Citation.]" [Citation.] Since at least 1980, our courts have recognized that evidence of gang sociology and psychology is beyond common experience and thus a proper subject for expert testimony. [Citations.] [¶] The People are entitled to "introduce evidence of gang affiliation and activity where such evidence is relevant to an issue of motive or intent." [Citation.] "[B]ecause a motive is ordinarily the incentive for criminal behavior, its probative value generally exceeds its prejudicial effect, and wide latitude is permitted in admitting evidence of its existence." ' [Citation.] Accordingly, when evidence of gang activity or affiliation is relevant to motive, it may properly be introduced even if prejudicial." (*People v. Garcia, supra,* 168 Cal.App.4th at p. 275; *People v. Gardeley* (1996) 14 Cal.4th 605, 617; *People v. Gonzalez* (2005) 126 Cal.App.4th 1539, 1550 ["Expert testimony repeatedly has been offered to show the 'motivation for a particular

crime, generally retaliation or intimidation' and 'whether and how a crime was committed to benefit or promote a gang.' "].)

In *People v. Olguin, supra,* 31 Cal.App.4th at p. 1371, the defendant objected to the following exchange with a gang expert: " 'Q. Now, do you have an opinion as to a gang member's expectation of what will result from, let's say, a mutual yelling out of gang names or affiliations? [¶] A. Yes. [¶] Q. And what is that opinion? [¶] A. The gang member would expect a violent confrontation.' " The court held the officer's testimony did not exceed the permissible scope because it "focused on what gangs and gang members typically expect and not on [the defendant's] subjective expectation in this instance." (*Ibid.*)

Scott cites the following exchange during Detective Collins's testimony: "Q. Based on your experience, do verbal arguments between rival gang members often turn into physical altercations? [¶] A. Yes, they do. [¶] Q. And taken a step further, do these physical altercations often turn violent and involved serious injuries or death? [¶] A. Yes. [¶] Q. And in these incidents, it is often that weapons are used during these verbal altercations that escalate? [¶] A. Yes. [¶] Q. From your experience, are gang members who are involved in physical fights aware that this action often results in serious injury or death? [¶] [¶] [A.] Yes."

Scott submits that the testimony was "nothing more than a thinly veiled expression on an ultimate issue in this case, to wit, whether it was reasonably foreseeable (to . . . Scott) that a physical fight often results in serious injury or death." Detective Collins, however, did not testify about Defendants' subjective knowledge that gang warfare often

33

turns deadly, he was testifying generally about the knowledge of gang members. The testimony is similar to that approved of in *People v. Olguin, supra,* 31 Cal.App.4th at p. 1371. It is also similar to the gang expert testimony in *Medina, supra,* 46 Cal.4th at p. 918 ["When gangs have a disagreement, you can almost guarantee it's going to result in some form of violence, whether that be punching and kicking or ultimately having somebody shot and killed."].) The evidence does not exceed the permissible scope of gang expert testimony. "It is difficult to imagine a clearer need for expert explication than that presented by a subculture in which this type of mindless retaliation promotes 'respect.' " (*People v. Olguin, supra,* 31 Cal.App.4th at p. 1384.)

Later in Detective Collins's testimony, the issue of whether Defendants were active gang members was addressed. Scott and Roberson do not dispute that Defendants' names could, of course, properly be used in that testimony. In conjunction with that evidence, the following exchange took place: "Q. . . . Do you have an opinion as to whether . . . Scott would have knowledge of Emerald Hills criminal street gang's criminal activity? [¶] A. Yes. I believe he would be aware of them. [¶] Q. And the same question in regards to . . . Roberson. [¶] A. Yes." Detective Collins also opined Craig would have knowledge of Emerald Hills's criminal activity.

Scott and Roberson complain that this testimony impermissibly went to their subjective knowledge. "An expert . . . may not testify that an individual had specific knowledge or possessed a specific intent." (*People v. Garcia, supra,* 153 Cal.App.4th at p. 1513, citing *People v. Killebrew* (2003) 103 Cal.App.4th 655, 658.) The People assert the testimony was more akin to objective knowledge than subjective knowledge because

34

Detective Collins opined that Defendants *would* be aware of Emerald Hills' criminal street gang activity, rather than that they *were* aware of it.

On this record, we agree with the People. Detective Collins's testimony was lengthy and he repeatedly discussed gang culture and psychology *generally*. He acknowledged he did not participate in the investigation of this case or interview any of the Defendants. The jury likely understood Detective Collins lacked knowledge as to what whether Defendants were actually aware of Emerald Hills's criminal activities.

Additionally, even if this testimony should have been excluded, reversal is unwarranted. A harmless error analysis applies to the admission of gang expert testimony. (*People v. Valdez, supra,* 58 Cal.App.4th at p. 511, citing *People v. Watson* (1956) 46 Cal.2d 818, 836.) "Under *Watson*, defendant must demonstrate a reasonable probability that a result more favorable to defendant would have been reached absent the error." (*People v. Lucas* (2014) 60 Cal.4th 153, 263.) Defendants' knowledge of Emerald Hills's criminal activities was but one factor relevant to foreseeability and culpability under the natural and probable consequences doctrine, and thus the evidence was not tantamount to an opinion of guilt. (See *People v. Valdez, supra,* at p. 509.) Detective Collins properly testified that Defendants were active members of Emerald Hills, the shootings were done for the benefit of the gang, and gang members *generally* know fistfights between rival gang members often escalate and turn deadly. It is not reasonably probable the jury would have found in favor of Defendants absent Detective Collins's opinion they would have knowledge of Emerald Hills's prior criminal activities.

B

*Threats Against Mallard*

Craig contends the court erred by allowing evidence Mallard was warned against testifying. " '[A]n appellate court applies the abuse of discretion standard of review to any ruling by a trial court on the admissibility of evidence, including one that turns on the relative probativeness and prejudice of the evidence in question [citations]. . . . [Citations.]' 'The admission of relevant evidence will not offend due process unless the evidence is so prejudicial as to render the defendant's trial fundamentally unfair.' " (*People v. Jablonski* (2006) 37 Cal.4th 774, 805.) "A trial court abuses its discretion when its ruling ' "fall[s] 'outside the bounds of reason.' " ' " (*People v. Benavides* (2005) 35 Cal.4th 69, 88.)

Mallard, who was jailed in the same local facility as Craig, testified he was in court against his will. He was placed in protective custody after 10 to 15 men came to his cell door and referred to him as "Tilt," a nickname Craig used for him, and said, "Tank," which is Craig's nickname, "said what's up?" The men also said they knew Mallard was a "snitch" because they had his "paperwork," meaning police reports, and "when his cell door opens for breakfast, he would be assaulted." The court instructed the jury to consider the evidence for the limited purpose of evaluating the credibility and weight of Mallard's testimony about Craig's admission that he was the shooter.

" '[E]vidence that a witness is afraid to testify or fears retaliation for testifying is relevant to the credibility of that witness and is therefore admissible. [Citations.] An

explanation of the basis for the witness's fear is likewise relevant to her [or his] credibility and is well within the discretion of the trial court.' " (*People v. Mendoza, supra,* 52 Cal.4th at p. 1084.) "A witness who testifies despite fear of recrimination of *any* kind by *anyone* is more credible because of his or her personal stake in the testimony. Just as the fact a witness expects to receive something in exchange for testimony may be considered in evaluating his or her credibility." (*People v. Olguin, supra,* 31 Cal.App.4th at pp. 1368-1369.)

Craig acknowledges the evidence was relevant to Mallard's credibility. He asserts the court should have nonetheless excluded the evidence under Evidence Code section 352, because its prejudicial effect substantially outweighed its probative value. Craig, however, forfeited appellate review of the issue by not objecting on that specific ground at the trial court. (*People v. Chism* (2014) 58 Cal.4th 1266, 1292-1293.) Craig objected on the grounds of hearsay, lack of foundation, and relevancy, and the court overruled the objections, explaining the evidence "is not offered for the truth of the matter. What is important is that the person who approached . . . Mallard used . . . Craig's name, which I think is then relevant to . . . Mallard's credibility."

Craig submits an Evidence Code section 352 objection to virtually any evidence was automatically preserved for appeal because he filed a document titled "Motions In Limine-Objections to Proposed Trial Evidence." The document states: "As to the testimony of each witness and as to each document which may appear as an Exhibit, we list the following objections: [¶] 1. Irrelevant [¶] 2. Foundation [¶] 3. Hearsay [¶]

4. Violation of Section 352." Craig does not cite the record to show the court agreed to his attempt to circumvent rules pertaining to the necessity of specific objections to the evidence, and we reject that notion.

Under Evidence Code section 353, a judgment shall not be reversed for the erroneous admission of evidence unless "(a) There appears of record an objection to or a motion to exclude or to strike the evidence that was timely made and so stated *as to make clear the specific ground of the objection* or motion; and [¶] (b) The court which passes upon the effect of the error or errors is of the opinion that the admitted evidence should have been excluded on the ground stated and that the error or errors complained of resulted in a miscarriage of justice." (Italics added.) "This forfeiture rule, while subject to some exceptions, serves an important function, for a timely and specific objection 'provide[s] the trial court and any moving party the opportunity to meet and cure any defect to which an objection has been made.' " (*People v. Tom* (2014) 59 Cal.4th 1210, 1239.)

Craig cites the court's comment, "Let's be very clear, all objections that all counsel have made with respect to *this evidence* during in limine motions . . . are deemed made again right now, and my rulings—previous rulings will stand." (Italics added.) The comment is unhelpful, because the term "this evidence" refers exclusively to wiretap recordings.

C

*Johnson's Recorded Telephone Calls*

Additionally, Craig asserts the court abused its discretion by denying his request that it conduct an in camera review of 50 to 60 hours of Johnson's untranscribed recorded telephone calls, which the San Diego County Sheriff's Department produced under subpoena. The court began listening to the recordings, but discovered they are "not easy to hear," "there is a great deal of what I will call ethnic speech in them, and there is slang and terminology that I don't . . . fully understand." The court was "concerned that what we're dealing with here is a fishing expedition." The court imposed a good cause requirement and found Defendants made no such showing.[12]

"As a rule, a criminal defendant 'may compel discovery by demonstrating that the requested information will facilitate the ascertainment of the facts and a fair trial.' " (*People v. Kaurish* (1990) 52 Cal.3d 648, 686.) "Although policy may favor granting liberal discovery to criminal defendants, courts may nevertheless refuse to grant discovery if the burdens placed on government and on third parties *substantially* outweigh the demonstrated need for discovery." (*Ibid.*) The court may disallow discovery that "amount[s] to nothing more than a fishing expedition." (*People v. Serrata* (1976) 62 Cal.App.3d 9, 15.)

---

12    The court later disclosed eight to 10 hours of Johnson's calls with his former girlfriend, Torres, based on inconsistencies in her statements before and after he implicated Defendants.

Craig asserts the court should not have imposed a good cause requirement, because he could not determine the impeachment value of the calls without their disclosure. Any abuse of discretion, however, was harmless because Defendants thoroughly attacked Johnson's credibility through other evidence, such as his own admission of lying, and the testimony of fellow inmates Wiggins and Jacquette that Johnson was terrified of a life sentence and would do anything to cut a deal with the prosecution.

D

Craig asks us to independently review other sealed records the trial court determined were not relevant to his defense. The appellate "court routinely independently examines the sealed records of . . . in-camera hearings to determine whether the trial court abused its discretion in denying a defendant's motion for disclosure . . . ." (*People v. Prince* (2007) 40 Cal.4th 1179, 1285.)

The sealed records include Johnson's remaining jail records, such as lists of visitors and lists of numbers he called; the court's synopsis of 18 letters Johnson wrote to his former girlfriend, Torres; and the court's notes from a proceeding in which it decided to exclude the testimony of former Belo employee, who was a paid informant, as to gang members frequenting the club. We have reviewed all sealed records provided us and find no exculpatory or impeachment material.

IV

*Jury Instructions*

A

Roberson contends the court erred by refusing to instruct the jury with CALCRIM No. 505, on perfect self-defense. We review a claim of instructional error de novo. (*People v. Ghebretensae* (2013) 222 Cal.App.4th 741, 759.)

The court has a "duty to instruct on all principles closely and openly connected with the facts of the case, and which are necessary for the jury's understanding of the case." (*People v. Boyer* (2006) 38 Cal.4th 412, 468-469.) The "court must instruct on an affirmative defense . . . , even if the absence of a request, 'if it appears the defendant is relying on such a defense, or if there is substantial evidence supportive of such a defense and the defense is not inconsistent with the defendant's theory of the case.' " (*Id.* at p. 469.)

" 'The doctrine of self-defense embraces two types: perfect and imperfect.' " (*People v. Iraheta* (2014) 227 Cal.App.4th 611, 620.) "A killing committed in so-called perfect self-defense is neither murder nor manslaughter, but instead is justifiable homicide. [Citations.] 'For perfect self-defense, one must actually *and* reasonably believe in the necessity of defending oneself [or another] from imminent danger of death or great bodily injury.' " (*People v. Lopez* (2011) 199 Cal.App.4th 1297, 1305.) "[T]he defendant's fear must be of imminent harm. [Citation.] 'Fear of future harm—no matter how great the fear and no matter how great the likelihood of the harm—will not suffice.' " (*Ibid.*) To constitute perfect self-defense, the belief must be objectively reasonable.

41

(*People v. Battle* (2011) 198 Cal.App.4th 50, 72.)  For instance, "the use of lethal force in response to being shot at repeatedly is perfect self-defense and no crime."  (*People v. Duff* (2014) 58 Cal.4th 527, 562.)[13]

Roberson complains that substantial evidence shows several members of Turner's group attacked a member of Defendants' group and beat him while he lay defenseless on the ground, yet the "jury was never instructed [Defendants] could defend *the person on the ground* with deadly force."  (Italics added.)  Roberson cites *People v. Aguilar* (1997) 16 Cal.4th 1023, which noted, but did not decide, that footwear may be a deadly weapon within the meaning of section 245, subdisivion (a)(1), because "some footwear, such as hobnailed or steel-toed boots, is capable of being wielded in a way likely to produce death or serious injury."  (*Id.* at p. 1035.)

Roberson cites a witness's testimony that a man wearing a hoodie "was down on the ground" and "there were four people that were punching" him, and another witness's testimony that she saw a man wearing a hoodie fall to the ground, and it appeared that a man in a burgundy shirt was preparing to attack him, and "that's when the shots rang out." Turner wore a red shirt, not a burgundy shirt.

The court determined the evidence does not support a finding that at the time of the shooting, the shooter reasonably "believed that either he or a third party was in imminent danger of . . . death or great bodily injury."  We find no error.  Roberson

---

13     The court did instruct the jury on the lesser included offense of voluntary manslaughter, based on imperfect self-defense, which "is the actual, but unreasonable, belief in the need to resort to self-defense to protect oneself from imminent peril." (*People v. Vasquez* (2006) 136 Cal.App.4th 1176, 1177.)

concedes no witness "testified a single member of [Defendants'] group was attacked on the ground." Johnson testified that when the shootings occurred, Craig, Roberson, and Scott, were all *standing* near him. Further, Turner was the intended victim of the shooting, and there is no evidence he was involved in the attack of the man on the ground. The two photographs taken at the scene immediately before the shootings, show Johnson and Turner squaring off against each other. They had not even begun to fight and there is no evidence Turner was armed. He did not pose an imminent threat of death or serious bodily injury to Roberson or anyone else.

B

In a similar vein, Roberson submits the court had the sua sponte duty to instruct the jury with this optional language from CALCRIM No. 3471, the instruction on self defense in the mutual combat context: "If you decide the defendant started the fight using non-deadly force, and the opponent responded with such sudden and deadly force that the defendant could not withdraw from the fight, then the defendant had the right to defend [himself] with deadly force and was not required to try to stop fighting."[14] He objects that the "jury was never instructed [Defendants'] group could defend the person on the ground with deadly force without first withdrawing from the fight if Turner's group escalated the fight."

---

[14] The jury was instructed on this version of CALCRIM No. 3471: "A person who engages in mutual combat or who starts a fight has a right to self-defense only if: [¶] 1. He actually and in good faith tried to stop fighting; [¶] 2. He indicated, by word or by conduct, to his opponent, in a way that a reasonable person would understand, that he wanted to stop fighting and that he had stopped fighting; [¶] AND [¶] 3. He gave his opponent a chance to stop fighting."

43

We find no error. The intended target was Turner, and no evidence supports a finding he responded with sudden and deadly force, making it impossible for the shooter to withdraw.

C

Roberson also contends the court erred by not sua sponte instructing the jury to determine whether Turner was an accomplice for purposes of the firearm enhancement on count 2 for the attempted murder of Turner. Specifically, Roberson asserts there was substantial evidence to support a finding Turner aided and abetted the target offense of simple assault or public fight.

Section 12022.53, subdivision (d) provides: "Notwithstanding any other provision of law, any person who, in the commission of a felony specified in subdivision (a), Section 246, or subdivision (c) or (d) of Section 26100, personally and intentionally discharges a firearm and proximately causes great bodily injury, as defined in Section 12022.7, or death, to any person *other than an accomplice,* shall be punished by an additional and consecutive term of imprisonment in the state prison for 25 years to life." (Italics added.) "If the victim is an accomplice to the crime he or she and defendant intended but ends up the victim of one of the enumerated offenses, the exception in section 12022.53, subdivision (d) applies." (*People v. Flores* (2005) 129 Cal.App.4th 174, 182 (*Flores*).) "The Legislature apparently decided that killing one's accomplice is less blameworthy (or at least less deserving of punishment) than killing a nonaccomplice." (*Id.* at p. 181.)

Roberson's claim that persons engaged in a fistfight *against each other* are accomplices is unpersuasive. An accomplice is one who "aided and abetted the defendant" or "was involved in a conspiracy in which that person harbored the intent to commit the offense that was the object of the conspiracy." (*People v. Garceau* (1993) 6 Cal.4th 140, 183, overruled on another ground in *People v. Yeoman* (2003) 31 Cal.4th 93, 117-118.) " 'Each member of the conspiracy is liable for the acts of any of the others in carrying out the *common* purpose, i.e., all acts within the reasonable and probable consequences of the common unlawful design.' " (*Flores, supra,* 129 Cal.App.4th at p. 182.) Turner and Defendants had no common purpose; they were on opposite sides of a rival gang dispute. Thus, substantial evidence does not support an instruction on the accomplice exception.

Roberson's reliance on *Flores, supra,* 129 Cal.App.4th 174, is misplaced. In *Flores,* the defendant attempted to shoot a rival gang member during a fight, but accidentally shot a fellow gang member. (*Id.* at p. 180.) The Court of Appeal reversed the sentence for the firearm enhancement because the court did not instruct the jury on the accomplice exception of section 12022.53, subdivision (d). The opinion explains the jury should have had "the opportunity to consider whether [the victim] was an accomplice to defendant's discharge of the firearm either as an aider and abettor or as a

45

conconspirator." (*Flores,* at p. 183.) *Flores* does not suggest *rival* gang members involved in a fistfight are aiders and abettors or coconspirators of each other.[15]

V

*Sentencing*

A

Roberson contends the court erred in sentencing him on the conviction for assault with a firearm. (§ 245, subd. (a)(2).) For that offense, the court sentenced him to a consecutive term of 25 years to life under the "Three Strikes" law, plus a consecutive term of five years for the serious felony enhancement (§ 667, subd. (a)(1)), plus a consecutive term of five years for the gang enhancement (§ 186.22, subd. (b)(1)).

Roberson cites section 186.22, subdivision (b)(5) (§ 186.22(b)(5)), which provides that "any person who violates this subdivision in the commission of a felony punishable by imprisonment in the state prison for life shall not be paroled until a minimum of 15 calendar years have been served." Roberson asserts that when a felony offense is punishable under the Three Strikes law, it is a "felony punishable by imprisonment in the state prison for life" within the meaning of section 186.22(b)(5).

The People disagree, citing *People v. Montes* (2003) 31 Cal.4th 350. In *People v. Montes,* the issue was whether section 186.22(b)(5) applies when a sentence for a felony and its enhancement results in a life term. Our high court narrowly construed section

---

[15]     Scott, joined by Roberson, also raises instructional errors pertaining to his conviction of first degree murder under the natural and probable consequences doctrine. These issues are rendered moot by *Chui, supra,* 59 Cal.4th 155, and our reversal of Defendants' first degree murder convictions.

186.22(b)(5) to apply "only where the felony by its own terms provides for a life sentence." (*People v. Montes, supra,* at p. 352.) In *People v. Jones* (2009) 47 Cal.4th 566 (*Jones*), however, the court clarified that *People v. Montes, supra,* 31 Cal.4th 350, applies when a sentence enhancement is at issue. When a life sentence results from a penalty provision, or alternative penalty for the underlying felony itself, section 186.22(b)(5) applies. (*Jones,* at p. 578.)

In *People v. Williams* (2014) 227 Cal.App.4th 733 (*Williams*), the defendant received life sentences under the Three Strikes law for three felonies. Based on *Jones, supra,* 47 Cal.4th 566, the appellate court in *Williams* held the trial court erred by imposing 10-year terms for gang enhancements under section 186.22, subdivision (b)(1)(C) rather than the 15-year minimum parole eligibility requirement of section 186.22(b)(5). *Williams* explains: "The Three Strikes law is a penalty provision, not an enhancement. It is not an enhancement because it does not add an additional term of imprisonment to the base term. Instead, it provides for an alternate sentence (25 years to life) when it is proven that the defendant has suffered at last two prior serious felony convictions." (*Williams,* at p. 744; *People v. Superior Court* (*Romero*) (1996) 13 Cal.4th 497, 527 ["The Three Strikes law . . . articulates an alternative sentencing scheme for the current offense rather than an enhancement."].) We agree with the *Williams* analysis and modify the judgment accordingly.

B

1

The People, who do not appeal, contend the court erred by sentencing Scott to a 10-year term for the gun enhancement on count 1. The People assert a 25-years-to-life term was mandated.

The " 'unauthorized sentence' concept constitutes a narrow exception to the general requirement that only those claims properly raised and preserved by the parties are reviewable on appeal." (*People v. Scott* (1994) 9 Cal.4th 331, 354.) A "sentence is generally 'unauthorized' where it could not lawfully be imposed under any circumstance in the particular case. Appellate courts are willing to intervene in the first instance because such error is 'clear and correctable' independent of any factual issues presented by the record at sentencing. [Citation.] . . . [L]egal error resulting in an unauthorized sentence commonly occurs where the court violates mandatory provisions governing the length of confinement. It does not follow, however, that nonwaivable error is involved whenever a prison sentence is challenged on appeal." (*Ibid.*) " 'An appellate court may "correct a sentence that is not authorized by law whenever the error comes to the attention of the court." ' " (*In re Birdwell* (1996) 50 Cal.App.4th 926, 946.)

In imposing a 10-year term, the court cited Eighth Amendment concerns given

Scott's age of 17 years when the crimes were committed.[16]  The court had evidence that the life expectancy for an African-American male was 67 years, which it rounded to 70 years.  Scott's probation report indicates he is not eligible for good time credits because he was convicted of murder.  (§ 2933.2.)

The court cited *Miller v. Alabama* (2012) 567 U.S. ___ [132 S.Ct. 2455, 2469] (*Miller*), a homicide case, in which the United States Supreme Court held the "Eighth Amendment forbids a sentencing scheme that mandates life in prison without possibility of parole for juvenile offenders."  *Miller* does not foreclose a life sentence without the possibility of parole in a homicide case for " 'the rare juvenile offender whose crime reflects irreparable corruption.' "  (*Id.* at p. 2469.)  In imposing such a sentence, however, the trial court must "take into account how children are different, and how those differences counsel against irrevocably sentencing them to a lifetime in prison."  (*Ibid.*; *Graham v. Florida* (2010) 560 U.S. 48 [prohibiting life without parole sentence for juvenile offender in nonhomicide case.].)

In *People v. Caballero* (2012) 55 Cal.4th 262, 268 (*Caballero*), the California Supreme Court, citing *Graham,* reversed a 110-years-to-life sentence for three counts of premeditated attempted murder, with gang and firearm enhancements.  The court held that sentencing a juvenile for a nonhomicide offense "to a term of years with a parole eligibility date that falls outside [his] natural life expectancy constitutes cruel and unusual

---

16     The Eighth Amendment to the United States Constitution declares:  "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted."  Article I, section 17 of the California Constitution also proscribes "[c]ruel or unusual punishment."

punishment in violation of the Eighth Amendment," because the sentence was the "functional equivalent of a life without parole sentence." (*Id.* at pp. 267-268.) "[T]he term 'life expectancy' means the normal life expectancy of a healthy person of defendant's age and gender living in the United States." (*Id.* at p. 267, fn. 3.)

In *Caballerro*, the court also concluded "the state may not deprive [juveniles] at sentencing of a meaningful opportunity to demonstrate their rehabilitation and fitness to reenter society in the future." (*Caballero, supra,* 55 Cal.4th at p. 268.) *Caballero* remanded the matter to the trial court for its reconsideration, and directed it to "consider all mitigating circumstances attendant in the juvenile's crime and life, including but not limited to his or her chronological age at the time of the crime, whether the juvenile offender was a direct perpetrator or an aider and abettor, and his or her physical and mental development, so that it can impose a time when the juvenile offender will be able to seek parole from the parole board. The Board of Parole Hearings will then determine whether the juvenile offender must be released from prison 'based on demonstrated maturity and rehabilitation.' " (*Id.* at pp. 268-269.) The opinion gave no further guidance, noting "every case will be different." (*Id.* at p. 269.)

*Caballero* left open the issue of "*Miller's* application in the homicide context to a case that poses the issue." (*Caballero, supra,* 55 Cal.4th at p. 268, fn. 4.) In *People v. Thomas* (2012) 211 Cal.App.4th 987 (*Thomas*), this court held that in light of *Miller, supra,* 567 U.S. ___ [132 S.Ct. 2455], a sentence of 196 years to life for gang-related murders and other serious crimes committed by a juvenile offender "must be reversed and the matter remanded for resentencing in the exercise of the court's discretion." (*Thomas,*

at p. 1016.) We "express[ed] no opinion as to what sentence should be imposed in the exercise of that discretion." (*Ibid.*)

We empathize with the trial court, because there is a dearth of guidance on how lengthy mandatory sentencing provisions applicable to juvenile offenders tried as adults are to be applied in light of Eighth Amendment proscriptions.[17] In *People v. Perez* (2013) 214 Cal.App.4th 49, 57 (*Perez*), the court noted: "The issue of how long someone under the age of 18 may be sentenced to prison has been the subject of considerable judicial attention recently in the wake of *Miller* [*supra,* 567 U.S. ___ [132 S.Ct. 2455]]." After reviewing California appellate cases on the issue, the court explained: "There is a bright line between LWOPs and long sentences *with* eligibility for parole *if* there is some meaningful life expectancy left when the offender becomes eligible for parole. . . . [¶] How *much* life expectancy must remain at the time of eligibility for parole of course remains a matter for future judicial development." (*Perez,* at p. 57.)

We conclude, however, that the court did not have the option of selecting a 10-year gun-enhancement term under subdivisions (b) of section 12022.53, because that term is simply inapplicable. Subdivision (b) of section 12022.53 applies when the firearm is not even operable or loaded. Subdivision (d) of section 12022.53 mandates a 25years-to-life term "[n]otwithstanding any other provision of law" when the gun use

---

17    The California Supreme Court is currently reviewing the matter. (*In re Alatrist* (2013) 163 Cal.Rptr.3d 748, review granted Feb. 19, 2014, No. S214652, consolidated with *In re Bonilla,* review granted Feb. 19, 2014, No. S214960.)

51

"proximately causes great bodily injury . . . or death."[18] We do not countenance the piecemeal imposition of inapplicable enhancement terms on juvenile offenders to arrive at an acceptable total aggregate term. "In passing sentence, the court has a duty to determine and impose the punishment prescribed by law." (*People v. Cattaneo* (1990) 217 Cal.App.3d 1577, 1589.)

In our view, if the court believed a total aggregate term of 50 years to life would be the functional equivalent of a life term without the possibility of parole, in violation of Scott's Eighth Amendment rights, the better approach would have been to impose the mandated 25-years-to-life enhancement term (§ 122053, subd. (d)), but in the exercise of discretion "stay execution of so much of the term as is prohibited." (Cal. Rules of Court, rule 4.447.)[19] That point, however, is moot since we reverse Scott's first degree murder conviction, which carried a 25-years-to-life term. We reverse the 10-year gun

---

[18]    Scott's gun enhancement is also based on subdivision (e)(1) of section 12022.53, which applies to persons who violate section 186.22, subdivision (b), which pertains to felonies committed for the benefit of, at the direction of, or in association with any criminal street gang.

[19]    California Rules of Court, rule 4.447 provides in full: "No finding of an enhancement may be stricken or dismissed because imposition of the term either is *prohibited by law* or exceeds limitations on the imposition of multiple enhancements. The sentencing judge must impose sentence for the aggregate term of imprisonment computed without reference to those prohibitions and limitations, and must thereupon stay execution of so much of the term as is prohibited or exceeds the applicable limit. The stay will become permanent on the defendant's service of the portion of the sentence not stayed." (Italics added.) The rule was not enacted with juvenile offenders in mind, but it appears to give the trial court needed flexibility in satisfying mandatory sentencing provisions and the Eighth Amendment's prohibition of cruel and unusual punishment, in light of United States Supreme Court and California Supreme Court authority.

enhancement and remand the matter for the court's reconsideration in conjunction with its resentencing of Scott for second degree murder.[20]

2

Scott contends that on resentencing, double jeopardy principles prohibit the imposition of a sentence greater than his original sentence of 35 years to life. The "prohibition against double jeopardy 'generally prohibits the court from imposing a greater sentence on remand following an appeal.' " (*People v. Torres* (2008) 163 Cal.App.4th 1420, 1432 (*Torres*).) However, the " 'rule is otherwise when a trial court pronounces an unauthorized sentence. Such a sentence is subject to being set aside judicially and there is no bar to the imposition of a proper judgment thereafter, even though it is more severe than the original unauthorized pronouncement.' " (*People v. Mustafaa* (1994) 22 Cal.App.4th 1305, 1311 (*Mustafaa*).)

In *Musfataa*, this court held the rule against double jeopardy applies when the court "imposed a legal aggregate sentence, only fashioning it in an unauthorized manner." (*Mustafaa, supra,* 22 Cal.App.4th at pp. 1311-1312.) We explained: "The court's error in separating the convictions from their attendant enhancements, though unauthorized by law, does not make the total sentence illegal. On remand the court may not impose a

---

20      Effective January 1, 2014, the Legislate enacted section 3051 to address parole eligibility for juvenile offenders. "A person who was convicted of a controlling offense that was committed before the person had attained 18 years of age and for which the sentence is a term of 25 years to life shall be eligible for release on parole by the board during his or her 25th year of incarceration." (§ 3051, subd. (b)(3).) A juvenile offender who has been sentenced to "a life term of less than 25 years to life shall be eligible for release on parole by the board during his or her 20th year of incarceration." (§ 3051, subd. (b)(2).)

total sentence more severe than the sentence originally imposed." (*Id.* at p. 1312; accord, *Torres, supra,* 163 Cal.App.4th 1420, 1432-1433.)  Here, likewise, the court imposed a legal aggregate sentence, given Scott's age when the crimes were committed and Eighth Amendment concerns, but it fashioned the sentence in an unauthorized manner by imposing an inapplicable gun enhancement.  Accordingly, on remand the court may not impose a sentence greater than 35 years to life.

## VI

### *Abstracts of Judgment*

The People agree the Defendants' abstracts of judgment must be corrected to comport with the court's oral pronouncement they are *jointly and severally* liable for the victim restitution ordered.  Further, the People point out that the abstracts must be corrected to show the amount of restitution is $14,578.87, rather than the slightly different amounts stated.  "As with other clerical errors, discrepancies between an abstract and the actual judgment as orally pronounced are subject to correction at any time, and should be corrected by a reviewing court when detected on appeal." (*People v.Scott* (2012) 203 Cal.App.4th 1303, 1324.)

## DISPOSITION

The judgment is reversed insofar as Dontaye Craig and Frederick Roberson's first degree murder convictions are concerned, and the matter is remanded with directions. The People may accept a reduction of the convictions to second degree murder or choose to retry them on the greater offense as direct perpetrators.  The People may also retry Craig on an alternative direct aider and abettor theory.  If the People accept a reduction,

54

the trial court shall enter judgment against Craig and Roberson for second degree murder and resentence them accordingly.

The judgment is modified to reduce Rashad Scott's first degree murder conviction to second degree murder, and the matter is remanded to the trial court for resentencing, including a reconsideration of the gun enhancement term on count 1. The judgment is also modified to delete the five-year gang enhancement imposed on Roberson for count 3 under Penal Code section 186.22, subdivision (b)(1) and to replace it with the 15-year minimum term for parole eligibility required by section 186.22, subdivision (b)(5).

Additionally, we direct the court to modify Defendants' abstracts of judgment to show victim restitution in the amount of $14,578.87 is a joint and several liability. The judgment is otherwise affirmed as modified. The trial court is directed to prepare and forward to the Department of Corrections and Rehabilitation certified copies of amended abstracts of judgment to reflect the judgment as modified.


O'ROURKE, J.

WE CONCUR:

McCONNELL, P. J.

NARES, J.

55